IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 2:23-CR-00001-RWS-JCF |
| KYLE FABIANO | : | |

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Dismiss Indictment As Violative Of The Second Amendment (Doc. 52) and Motion To Dismiss The Indictment For Failure To State An Offense (Doc. 53). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motions be **DENIED**.

## Factual and Procedural History

On July 16, 2015, Defendant was indicted in the Superior Court of Fannin County, Case No. 2015R193, for the offenses of arson in the first degree, criminal damage to property in the second degree, aggravated assault on a peace officer, possession of a firearm during commission of a felony, and using a hoax device with the intent to cause another to believe that such device is a destructive device. (Doc. 53-1 at 12-17). On December 1, 2015, Defendant pleaded guilty to the arson count[1] and was sentenced to 20 years of probation under Georgia's First Offender

---

[11] Arson in the first degree is a felony under Georgia law, punishable by "imprisonment for not less than one nor more than 20 years[.]" *See* O.C.G.A. § 16-7-60(c).

Act, O.C.G.A. §§ 42-8-60. (Doc. 53-1 at 1, 11; Doc. 53-2 at 11; Doc. 55-1 at 3).

Although the sentencing form did not check the box for First Offender Act (Doc.

53-1 at 1), Defendant's guilty plea was entered pursuant to the First Offender Act

(Doc. 55-1 at 1-3), and the sentencing hearing transcript makes clear that the

sentencing judge sentenced Defendant under the First Offender Act (Doc. 53-2 at

11-12). The judge explained to Defendant that under the First Offender Act, if

Defendant did not comply with the conditions of his probation, probation could be

revoked, and he could be sentenced to the maximum 20-year term of

imprisonment, but if he successfully completed all the terms of his probation, he

would be "adjudicated not guilty." (Doc. 53-2 at 11-12). The sentencing form also

stated under "First Offender Or Conditional Discharge":

> The Defendant consenting hereto, it is the judgment of the Court that no judgment of guilt be imposed at this time but that further proceedings are deferred and the Defendant is hereby sentenced to confinement at such institution as the Commissioner of the State Department of Corrections or the Court may direct, with the period of confinement to be computed as provided by law.
> Upon violation of the terms of probation, upon conviction for another crime during the period of probation, or under the Court's determination that the Defendant is or was not eligible for sentencing under the First Offender Act or for Conditional Discharge, the Court may enter an adjudication of guilt and proceed to sentence the Defendant to the maximum sentence as provided by law.
> Upon fulfillment of the terms of this sentence, or upon release of the Defendant by the Court prior to the termination of this sentence, the Defendant shall stand discharged of said offense without court adjudication of guilt and shall be completely exonerated of guilt of said offense charged.

(Doc. 53-1 at 2).

On April 12, 2018, a probation officer filed a "Petition for Adjudication of Guilt and Imposition of Sentence in First Offender Case" in the Superior Court of Fannin County, which charged Defendant with having "committed the new offenses of possession of a firearm by a convicted felon, possession of marijuana, and possession of drug related objects" on March 19, 2018 in Gilmer County, Georgia. (Doc. 55-1 at 5-6). That petition states that the court previously sentenced Defendant on December 1, 2015 "under the provisions of the First Offender Act . . . without an adjudication of guilt to serve a period [of 20 years] on probation." (Doc. 55-1 at 5). It appears that Defendant's First Offender Status was not revoked as a probation officer filed another "Petition For Adjudication Of Guilt And Imposition Of Sentence In First Offender Case," i.e., the 2015 arson case, on January 6, 2022. (Doc. 55-1 at 6). That petition alleged that Defendant had committed "the new offense of possession of firearm or knife during commission of or attempt to commit certain felonies," "receipt, possession or transport of firearm by convicted felon or felony first offender," "disorderly conduct," and "terroristic threats and acts"—all on or about December 14, 2021 in Gilmer County, Georgia. (Doc. 55-1 at 6). Defendant admitted that he "committed the new offense of receipt, possession or transport of firearm by convicted felon or felony first offender, etc on or about 12/14/2021 in Gilmer County, GA" and that he

3

"committed the new offense of disorderly conduct on or about 12/14/2021 in Gilmer, County, GA," and he agreed to serve 60 days in County Jail "in lieu of being returned to the Court for a revocation hearing before a Superior Court Judge." (Doc. 53-1 at 18). Defendant apparently remains on First Offender status in the Fannin County arson case; the parties have not submitted documentation that shows that it has been revoked or otherwise discharged. On February 25, 2022, Defendant was indicted in the Superior Court of Gilmer County, Georgia, Case No. 2022CR63, for the offenses of aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony on December 13, 2021. (Doc. 55-3 at 1-6).

In an Indictment filed in the United States District Court for the Northern District of Georgia on February 7, 2023, Defendant was charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1). On April 17, 2023, the case was certified ready for trial (Doc. 13), but the Government filed a First Superseding Indictment on July 11, 2023, which charged Defendant with two counts of possession of a firearm by a convicted felon. (Doc. 23). On August 2, 2023, the case was again certified ready for trial (Doc. 33), and a trial was scheduled for November 6, 2023 (Doc. 34). On September 1, 2023, the Government filed a motion to dismiss the counts in the original Indictment and First Superseding Indictment without prejudice (Doc. 41), which the Court granted

(Doc. 42), and the Government filed a Second Superseding Indictment on September 5, 2023 (Doc. 43). Count One of that Indictment charges Defendant with receiving a firearm, i.e., a Radical Firearms, model RF-15, multi-caliber rifle, "on a date unknown, but no earlier than on or about December 20, 2019, and no later than December 14, 2021," while under felony indictment as of July 16, 2015, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D). (Doc. 43 at 1). Count Two charges Defendant with receiving "at least one of the following firearms," i.e., "a Grand Power S.R.O., model Stribog SP9A3G, 9 mm caliber pistol" and "a Smith & Wesson, model M&P 22, .22 caliber pistol," "on a date unknown, but no earlier than on or about November 17, 2022, and no later than February 21, 2023," while "under at least one of the following felony indictments":

> 1) a felony indictment as of July 16, 2015, for Arson in the First Degree in Superior Court of Fannin County, Georgia, Case No. 2015R193, a crime punishable by imprisonment for a term exceeding one year; and
> 2) a felony indictment as of February 22, 2022, for Aggravated Assault and Possession of a Firearm During Commission of a Felony, among other charges, in Superior Court of Gilmore County, Georgia, Case No. 2022CR63, crimes punishable by imprisonment for a term exceeding one year[.]

(Doc. 43 at 1-2).

Defendant moved to dismiss the Second Superseding Indictment on two grounds. First, he moves to dismiss on the indictment as violative of the Second Amendment. (Doc. 52). The Government responded to that motion (Doc. 56), and

Defendant has replied (Doc. 58). Defendant also moves to dismiss the Indictment for failure to state an offense. (Doc. 53). The Government responded to that motion (Doc. 55), and Defendant has replied (Doc. 57). With briefing complete, the Court now considers the merits of Defendant's motions.[2]

**Discussion**

**I.**    **Motion To Dismiss Under Second Amendment (Doc. 52)**

Defendant argues that the Second Superseding Indictment should be dismissed because 18 U.S.C. § 922(n) violates the Second Amendment to the United States Constitution under the Supreme Court's test for assessing the constitutionality of firearms regulations set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (Doc. 52). The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. In *Bruen*, the Court set out the following test for determining the constitutionality of a firearms regulation under the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

---

[2] References to the parties' briefs and exhibits will be made by citation to the Court's CM-ECF pagination.

Only then may a court conclude that the individual's conduct falls
outside the Second Amendment's "unqualified command."

142 S. Ct. at 2129-30 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36,

50 n.10 (1961)).

Plaintiff is charged with two counts of receiving firearms while under felony

indictment, in violation of 18 U.S.C. § 922(n). (Doc. 43). That statute provides that

"[i]t shall be unlawful for any person who is under indictment for a crime

punishable by imprisonment for a term exceeding one year to ship or transport in

interstate or foreign commerce any firearm or ammunition or receive any firearm

or ammunition which has been shipped or transported in interstate or foreign

commerce." "The term 'indictment' includes an indictment or information in any

court under which a crime punishable by imprisonment for a term exceeding one

year may be prosecuted." 18 U.S.C. § 921(a)(14). Thus, in order to resolve

Defendant's motion to dismiss, the Court must determine whether: (1) the Second

Amendment presumptively protects Defendant and the charged conduct; and (2)

whether the Government has demonstrated that 18 U.S.C. § 922(n) "is consistent

with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at

2129-30.

A.     <u>**Whether The Second Amendment Protects Defendant And His Charged Conduct**</u>

Defendant asserts that he is "indisputably part of 'the people' protected by the Second Amendment," and "the plain text of the Second Amendment covers [his] charged conduct." (Doc. 52 at 6). The Government assumes for the sake of discussion "that the defendant's conduct is covered by the Second Amendment" (Doc. 56 at 3 and n.1), and the undersigned has done likewise. *See, e.g.*, *United States v. Adger*, No. CR 122-102, 2023 U.S. Dist. LEXIS 77363, at *7 (S.D. Ga. May 3, 2023) (assuming that "the Second Amendment covers Defendant and his course conduct," i.e., an alleged violation of § 922(n), and noting that "federal courts appear to agree the Second Amendment covers persons under felony indictment or information, and the conduct of shipping, transporting, and receiving firearms"), *adopted by* 2023 U.S. Dist. LEXIS 91033 (S.D. Ga. May 24, 2023).

The Court will now consider whether the Government has shown that 18 U.S.C. § 922(n) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. For the reasons discussed below, the undersigned finds that the Government has met that burden.

## B.  Whether The Government Has Demonstrated That § 922(n) Is Consistent With The Nation's Historical Tradition Of Firearm Regulation

In *Bruen*, the Court explained that the test set forth in that decision:

> requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses

> a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

142 S. Ct. at 2131. The Court wrote that "[w]hen confronting . . . present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' " *Id*. at 2132.

The Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but posited that the Court's decisions in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and *District of Columbia v. Heller*, 554 U.S. 570 (2008) "point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense," which "is 'the *central component* of the Second Amendment right.' " *Bruen*, 142 S. Ct. at 2132-33 (quoting *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)). "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that

9

burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id*. at 2133. The Court cautioned that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id*. at 2133. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it may still be analogous enough to pass constitutional muster." *Id*. (emphasis in original).

Turning to the regulation at issue in this case, 18 U.S.C. § 922(n), "Section 922(n) traces its roots to the 1938 Federal Firearms Act, which prohibited persons indicted for, or convicted of, a violent crime from shipping or transporting a firearm in interstate commerce." *Adger*, 2023 U.S. Dist. LEXIS 77363, at \*3-4; *see also Unites States v. Alston*, No. 5:23-CR-00021-FL-RN-1, 2023 U.S. Dist. LEXIS 128679, at \*20 (E.D. N.C. July 18, 2023). "In 1961, Congress expanded the statute to include persons indicted on any felony, both violent and non-violent." *Adger*, 2023 U.S. Dist. LEXIS 77363, at \*4; *see also Alston*, 2023 U.S. Dist. LEXIS 128679, at \*20. "The purpose of the 1961 Act was '[t]o strengthen the Federal Firearms Act,' and 'make it more difficult for the criminal elements of our society to obtain firearms.' " *Adger*, 2023 U.S. Dist. LEXIS 77363, at \*4 (quoting S. Rep. No. 364, 87th Cong., 1st Sess. 2 (1961) (internal quotation omitted)). "In 1968, the

Firearm Owners Protection Act added receipt of a firearm to the list of prohibited conduct and a person charged with a felony by information to the scope of prohibited persons." *Id*.; *see also Alston*, 2023 U.S. Dist. LEXIS 128679, at *20. " 'As described by the Supreme Court, the 1968 Act reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.' " *Adger*, 2023 U.S. Dist. LEXIS 77363, at *4 (quoting *United States v. Laurent*, 861 F. Supp. 2d 71, 83 (E.D.N.Y. 2011) (citing S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968))). "In 1986, Congress consolidated two subsections into the current § 922(n) without any changes to the scope of prohibited persons or conduct." *Id*. (citing *Laurent*, 861 F. Supp. 2d at 83); *see also Alston*, 2023 U.S. Dist. LEXIS 128679, at *20-21.

The Government has not identified a founding era regulation specifically restricting felony indictees from receiving firearms. The Government contends, however, that "prohibiting felony indictees from receiving firearms is consistent with the Nation's historical tradition of firearms regulation because it is relevantly similar to two historical analogues: (1) the Nation's historical tradition of disarming dangerous groups of people, and (2) surety laws restricting the gun rights of people accused of posing a threat." (Doc. 56 at 3).

With respect to the first proposed historical analogue, the Government asserts that "[f]ounding-era legislatures categorically disarmed groups of people

11

perceived to be dangerous or a threat to public safety, and based on reasoning that may or may not be improper today." (*Id*. at 7 (citing *Kanter v. Barr*, 919 F.3d 437, 456-58 (7th Cir. 2019) (Barrett, J., dissenting))). The Government contends that "[t]his tradition is reflected in the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents," which "the *Heller* Court identified as a highly influential precursor to the Second Amendment." (*Id*. (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010))). The Government asserts that that report "recognized the government could disarm the potentially dangerous, stating that citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.' " (*Id*.). The Government further asserts that "before the ratification of the Second Amendment in 1791, colonies or states had codified the common-law prohibition on going armed offensively and authorized the arrest of those who did so," citing as examples the Acts and Resolves of the Province of the Massachusetts Bay 52-53 (1869) (1692 statute) (Doc. 56-1 at 4-6); Acts and Laws of His Majesty's Province of New Hampshire: In New England with Sundry Acts of Parliament 17 (1771) (1701 statute) (Doc. 56-1 at 17); 1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131-32 (1821) (1741 statute) (Doc. 56-1 at 25-26); and Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature,

as Are Now in Force 33 (1794 (1786 statute) (Doc. 56-1 at 33). (Doc. 56 at 7-8). The Government also cites to legal treatises and cases discussing state-restricted gun ownership "by groups of people who refused to take oaths to the state, such as Catholics and Quakers," and as well as by Native Americans and slaves. (*Id*. at 8).

The Government argues that 18 U.S.C. § 922(n) "is relevantly similar to the historical regulations that disarmed dangerous people" because it " 'impose[s] a comparable burden on the right of armed self-defense,' " *Bruen*, 142 S. Ct. at 2133, as it "uses an objective criterion to categorically restrict a specific group's gun rights," but it is "less burdensome because it is limited and temporary in scope—applying only to the shipping, transport, and receipt of firearms while an indictment is pending" and "does not prohibit and indictee from maintaining possession of a firearm received prior to the indictment." (Doc. 56 at 8-9). The Government also argues that "similar to historical analogues, Section 922(n) seeks 'to combat violence and promote public safety' by keeping new firearms out of the hands of 'categories of potentially irresponsible people.' " (*Id*. at 9 (quoting *United States v. Laurent*, 861 F. Supp. 2d 71, 83-84 (E.D.N.Y. 2011))).

As to the Government's second proposed "historical analogue," i.e., "surety laws at the time of the founding," the Government points out that "[i]n England, surety laws required a person 'reasonably accused of posing a threat' to post a bond to cover any damage he might cause by carrying a gun." (Doc. 56 at 9

(quoting *Wrenn v. Dist. of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017)). The Government also quotes 4 William Blackstone, Commentaries on the Laws of England 252 (1769) to support the proposition that if an accused could not find sureties of the peace, the justice of the peace could commit the accused until he did so. (Doc. 56 at 9-10). The Government asserts that "the surety practice was adopted in the American colonies" and points to the Acts and Laws of His Majesty's Province of New-Hampshire in New-England with Sundry Acts of Parliament 2, a 1759 statute providing that "authorities could arrest a person who went armed in a threatening manner" and could " 'commit the offender to prison until he or she f[ound] such sureties for the peace and good behavior, as [was] required,' and could 'cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use.' " (Doc. 56 at 10; *see also* Doc. 56-1 at 30). The Government cites other colonial laws which "contained similar provisions," including Acts and Resolves of the Province of the Massachusetts Bay 52-53 (1869) (1692 statute) (Doc. 56-1 at 4-5; 2 Statutes at Large of Pennsylvania from 1682 to 1801, 23 (1896) (1700 statute) (Doc. 56-1 at 13); 1 Laws of The State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute) (Doc. 56-1 at 9); Acts and Laws of His Majesty's Province of New Hampshire: In New England with Sundry

Acts of Parliament 17 (1771) (1701 statute) (Doc. 56-1 at 17); and Acts and Laws of His Majesties Colony of Connecticut in New-England: Printed in 1702 and Now First Reissued 91 (1901) (1702 statute) (Doc. 56-1 at 20). (Doc. 56 at 10-11).

The Government asserts that "Section 922(n) and surety statutes at the time of the founding are relevantly similar" because "[s]urety statutes 'applied upon the determination by a justice of the peace or other legal proceeding that person's conduct made their possession of the weapon a heightened danger,' " and Section 922(n) imposes a comparable burden on the right of armed self-defense by applying gun restrictions 'only to a subset of persons—felony indictees—as to whom probable cause has been found, by a grand jury or its prosecutorial equivalent in the context of a consented-to felony information, to have committed a serious crime.' " (Doc. 56 at 11 (quoting *United States v. Rowson*, No. 22 Cr. 310 (PAE), 2023 U.S. Dist. LEXIS 13832, at *65 (S.D.N.Y. Jan. 26, 2023))). The Government contends that § 922(n) "arguably imposes a lesser burden because it does not disturb the indictee's right to continued possession of a firearm, nor does not prevent an individual from publicly carrying such firearms." (*Id*.). The Government argues further that "[b]oth the surety statutes and Section 922(n) are similarly justified by a reasonable fear of threats or violence in the community." (*Id*.). Thus, the Government contends, "[s]urety statutes . . . provide an additional

independent basis to conclude that Section 922(n) is consistent with the Nation's historical tradition of firearms regulations." (*Id.*).

Before considering whether § 922(n) passes constitutional muster following the *Bruen* decision, the Court addresses Defendant's assertion that the Government relies on the improper standard for determining whether § 922(n) is unconstitutional under the test set forth in *Bruen*. (*See* Doc. 52 at 7-8; Doc. 58 at 4-7). Defendant asserts that "relevantly similar" is an incorrect standard, and instead contends that the court should evaluate whether any proposed historical analogues are "distinctly similar" to § 922. (Doc. 52 at 7-8; Doc. 58 at 4-5). In *Bruen*, the Court explained that "[i]n some cases," a court's assessment of "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding . . . will be fairly straightforward," such as "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131. Defendant contends that the "distinctly similar" standard applies in this case because "individuals were being indicted with felonies during the founding era," and because the Government has not identified a "distinctly similar historical regulation addressing that problem," §

922(n) is "inconsistent with the Second Amendment" and the indictment must be dismissed. (Doc. 52 at 7-8; Doc. 58 at 4-7).

The Government argues that "potential gun violence by felony indictees release on bond is not a general societal problem that preoccupied the Founders in 1791 because felony indictees would likely have been detained." (Doc. 56 at 5 (citing *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)). The Government also points out that the Court in *Bruen* did not split its analysis into "(1) applying a 'distinctly similar' for laws 'address[ing] a general societal problem that has persisted since the 18th century,' and (2) applying 'reasoning by analogy' for laws addressing 'unprecedented societal concerns,' 'dramatic technological changes' or 'modern regulations that were unimaginable at the founding' " as Defendant contends. (*Id*. at 6 (quoting Doc. 52 at 7-8)). The Government notes that in *Bruen*, the Court "considered a law addressing a persistent problem, but still scoured centuries of English and American history for relevantly similar analogues." (*Id*. at 6 (citing *Bruen*, 142 S. Ct. at 2131-33, 2135-56)). The Government points out that the Court in *Bruen* used the phrase "distinctly similar" only once and "never referenced the purported 'distinctly similar' standard" as it considered whether early firearms regulations were analogous to New York's regulation of publicly carrying firearms, which "would surely qualify as a general societal problem that has persisted for centuries." (*Id*.).

17

The undersigned finds that it is proper for this Court to analyze whether the Government has identified founding era firearms restrictions that are analogous, i.e., "relevantly similar" to 18 U.S.C. § 922, consistent with the Court's discussion in *Bruen*, and the lack of a "distinctly similar" regulation is not dispositive. *See, e.g.*, *Rowson*, 2023 U.S. Dist. LEXIS 13832, at *50-51 ("Where the challenged law 'addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence' but it is not dispositive." (quoting *Bruen*, 142 S. Ct. at 2131)). As the Court explained in *Bruen*, "[w]hen confronting . . . present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' " *Bruen*, 142 S. Ct. at 2132. As discussed below, the courts that have considered challenges to § 922(n) since *Bruen* have engaged in that analogical inquiry and have considered whether historical firearm regulations are "relevantly similar" to § 922(n). The undersigned has done likewise.

The Eleventh Circuit has not yet considered whether 18 U.S.C. § 922(n) violates the Second Amendment under the test set forth in *Bruen*, i.e., whether it is

consistent with the Nation's historical tradition of firearm regulation, nor has any other Circuit squarely decided this issue. Several district courts, including at least two in the Eleventh Circuit, have considered the issue, and although a few courts have held that § 922(n) is unconstitutional, the majority of courts have found that the Government has shown that § 922(n) is consistent with the Nation's historical tradition of firearm regulation and have upheld the constitutionality of the statute against defendants' Second Amendment challenges.

In two post-*Bruen* cases in the Southern District of Georgia, the court found that § 922(n) does not violate the Second Amendment under *Bruen* because the government had demonstrated that § 922(n) is consistent with the Nation's historical traditions of firearm regulation, for the same reasons the Government advances in this case. *See United States v. Adger*, No. CR 122-102, 2023 U.S. Dist. LEXIS 77363, at *7-11 (S.D. Ga. May 3, 2023), *adopted by* 2023 U.S. Dist. LEXIS 91033 (S.D. Ga. May 24, 2023); *United States v. Smith*, No. CR 122-081, 2023 U.S. Dist. 69516, at *6-10 (S.D. Ga. Mar. 29, 2023), *adopted by* 2023 U.S. Dist. LEXIS 68517 (S.D. Ga. Apr. 19, 2023). In both cases, Magistrate Judge Brian K. Epps found that § 922(n) "does not interfere with the scope of the Second Amendment as understood in 1791 because of relevantly similar firearm regulations existing at or near this period of time." *Adger*, 2023 U.S. Dist. LEXIS 77363, at *8. Those "relevantly similar firearm regulations" include surety laws

19

and laws prohibiting firearm possession by classes of citizens based on perceived elevated risks of dangerousness. *Id*. at *8-10. With respect to surety laws, Judge Epps noted that in *Bruen*, the Court described mid-nineteenth surety laws as " 'requir[ing] any person who was reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Id*. at *8 (quoting *Bruen*, 142 S. Ct. at 2148). "Under these statutes, 'an individual's carrying of arms was "sufficient cause to require him to give surety of the peace" only when "attended with circumstances giving just reason to fear that he purposes to make unlawful use of them." ' " *Id*. (quoting *Bruen*, 142 S. Ct. at 2148). Judge Epps found that "[t]he similarity to § 922(n) is obvious. When an indictment or information establishes probable cause to believe a person had committed a felony offense, there is sufficient cause to fear the illegal use of a firearm if, while the charge is pending, the accused person ships, transports, or receives a firearm in interstate commerce." *Id*. "As explained by the court in *Rowson*, 'the period in which an indictment pends is a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or to others, thereby reasonably giving rise to fear of threats or violence.' " *Id*. at *8-9 (quoting *Rowson*, 2023 U.S. Dist. LEXIS 13832, at *66 (internal quotation omitted)). Judge Epps also noted that "[s]everal post-*Bruen* decisions recognized the similarities between these old

surety laws and § 922(n) when finding § 922(n) does not violate the Second Amendment." *Id*. at *9 and n.2 (collecting cases).

Judge Epps also found that "[i]n addition to the surety laws, there is a long and regrettable history of state legislatures prohibiting firearm possession by classes of citizens who, like persons under felony indictment or information, were perceived as elevated risk of dangerousness or criminality based on religion, race, or political identities," as "catalogued in *Rowson*, and the sources cited therein." *Id*. at *9 (citing *Rowson*, 2023 U.S. Dist. LEXIS 13832, at *55-59). Judge Epps acknowledged that "such efforts were misguided," but reasoned that "their existence proves a common, historical understanding the Second Amendment allows regulations curtailing gun rights by people legislatures identify as posing heightened risks of criminality or dangerousness. As other courts have concluded, these unfortunate examples support the conclusion that § 922(n) comports with the Nation's understanding of appropriate gun regulations under the Second Amendment." *Id*. at *9-10 (citing *Rowson*, 2023 U.S. Dist. LEXIS 13832, at *56-57 ("There is also ample evidence of colonial and revolutionary-era laws that disarmed groups of people perceived as *per se* dangerous, on the basis of their religious, racial, and political identities.")). Judge Epps' analysis, reasoning, and conclusions in the *Smith* case are the same as in *Adger*. *See Smith*, 2023 U.S. Dist. 69516, at *6-10. Thus, Judge Epps recommended that the defendants' motions to

dismiss the indictments and declare 18 U.S.C. § 922(n) unconstitutional as violative of the Second Amendment be denied. *Adger*, 2023 U.S. Dist. LEXIS 77363, at *13; *Smith*, 2023 U.S. Dist. LEXIS 69516, at *13. District Judge J. Randal Hall adopted those recommendations and denied the defendants' motions to dismiss. *United States v. Adger*, No. 122-102, 2023 U.S. Dist. LEXIS 91033 (S.D. Ga. May 24, 2023); *United States v. Smith*, CR 122-081, 2023 U.S. Dist. LEXIS 68517 (S.D. Ga. Apr. 19, 2023).

Several district courts in other circuits across the country have also denied defendants' motions to dismiss indictments charging violations of 18 U.S.C. § 922(n) for the same reasons as those given in *Adger* and *Smith*, i.e., that § 922(n) is consistent with the Nation's historical traditions of firearm regulations based on the Nation's history of surety laws and laws prohibiting possession of firearms by classes of people perceived to represent heightened risks of dangerousness or criminality. *See, e.g.*, *United States v. Alston*, No. 5:23-CR-00021-FL-RN-1, 2023 U.S. Dist. LEXIS 190306, at *5-8 (E.D.N.C. Oct. 24, 2023) (finding that the government had carried its burden to show that § 922(n) was consistent with the Nation's historical tradition of firearm regulation based on founding era laws concerning detention and bail and rejecting the defendant's argument that different burdens of proof apply to indictment and pretrial detention because "[t]his difference in the burden of proof . . . is a modern distinction not operative at the

time of the founding"); *United States v. Doney*, No. CR 23-77-BLG-SPW, 2023 U.S. Dist. LEXIS 178333, at *6-7 (D. Mont. Oct. 3, 2023) (noting that "[e]arly laws in this nation's history governed the carrying of firearms by people the government considered unvirtuous or dangerous," and "[f]or those indicted on misdemeanor or felony charges, manuals for justices of the peace allowed justices to seize weapons from prisoners after arrest" and "[i]ndictees for whom a surety had been issued breached the peace by carrying more weapons than they had previously"); *United States v. Rios*, No. SA-20-CR-00396-JKP, 2023 U.S. Dist. LEXIS 92413, at *1, 3-4 (W.D. Tex. May 26, 2023) (denying motion to dismiss § 922(n) charge because §922(n) is "sufficiently grounded in the Nation's history and tradition of firearms restrictions to pass constitutional muster" for the reasons the court provided in *United States v. Simien*, SA-22-CR-00379-JKP, 2023 U.S. Dist. LEXIS 23629 (W.D. Tex. Feb. 10, 2023), i.e., founding era surety laws "offer an imperfect, but relevantly similar analogue to § 922(n)," *Simien*, 2023 U.S. Dist. LEXIS 23629, at *18-20)); *United States v. Posada*, No. EP-22-1944(1)-KC, 2023 U.S. Dist. LEXIS 70981, at *8-13 (W.D. Tex. Apr. 20, 2023) (finding that defendant's challenge to § 922(n) failed because "the historical pretrial detention laws proffered by the Government burden the Second Amendment for similar reasons," and "although they burden the right in different ways, those differences do not render § 922(n) unconstitutional," and observing that that "conclusion is

consistent with the robust majority of courts to have considered § 922(n)'s constitutionality since *Bruen*" (collecting cases)); *United States v. Now*, No. 22-CR-150, 2023 U.S. Dist. LEXIS 58087, at *8, 16-22 (E.D. Wis. Mar. 15, 2023) (noting that "most district courts to have addressed the issue [of § 922(n)'s constitutionality] following *Bruen* have rejected the argument Now makes here" and recommending that defendant's motion to dismiss § 922(n) charge be denied because "there is a longstanding history and tradition in this nation of restricting access to firearms by persons the legislature deems uncommonly dangerous or 'unvirtuous' " and thus "§ 922 is consistent with . . . this nation's historical tradition regarding the right to keep and bear arms"), *adopted by* 2023 U.S. Dist. LEXIS 54731 (E.D. Wis. Mar. 30, 2023); *United States v. Bartucci*, No. 1:19-cr-00244-ADA-BAM, 2023 U.S. Dist. LEXIS 30680, at *17-29 (E.D. Cal. Feb. 23, 2023) (finding that § 922(n) is consistent with the Nation's historical tradition of firearms regulations based on "two strains of historical firearms regulations that this Court believes are analogous with the restrictions imposed by Section 922(n): colonial tradition of disarming those groups of persons perceived as dangerous and surety laws"); *United States v. Rowson*, No. 22 Cr. 310 (PAE), 2023 U.S. Dist. LEXIS 13832, at *50-55 (S.D.N.Y. Jan. 26, 2023) (recognizing the lack of an "18th-century replica of § 922(n)" or colonial era federal or state laws that "specifically targeted felony indictees," but finding that § 922(n) was consistent

with the Nation's historical tradition of firearms regulation because "the Court finds two lines of historical regulation of firearms to supply analogues sufficiently apposite to sustain § 922(n)": (1) "the Nation's long line of laws of disarming persons perceived as dangerous"; and (2) "historical surety laws"); *United States v. Kays*, 624 F. Supp. 3d 1262, 1267-68 (W.D. Okla. 2022) (finding that mid-19th century surety laws discussed in *Bruen* "are proper analogues for § 922(n)," and "[t]he government's reliance on these surety laws is sufficient to satisfy its burden to justify the firearm regulations of § 922(n)").

The undersigned finds the reasoning and conclusions in those cases to be persuasive and likewise finds that the Government has demonstrated that § 922(n)'s prohibition on a person's firearms while under felony indictment is consistent with the Nation's historical tradition of firearm regulation and therefore does not violate the Second Amendment. The undersigned finds particularly instructive the court's analysis in the *Adger* and *Smith* decisions discussed *supra* as well as the court's discussion in *Rowson*. In *Rowson*, the court found "two lines of historical regulation of firearms to supply analogues sufficiently apposite to sustain § 922(n)," i.e., "the Nation's long line of laws of disarming persons perceived as dangerous," and "historical surety laws." 2023 U.S. Dist. LEXIS 13832, at *55. As to the first line of analogical authority, the court discussed "[a] long line of statutes predating—and/or present at—the founding [that] disarmed persons deemed

25

inherently dangerous," including the seizure of arms in the custody or possession of any person deemed "dangerous to the Peace of the Kingdom" and "ample evidence of colonial and revolutionary-era laws that disarmed groups of people perceived as *per se* dangerous, on the basis of their religious, racial, and political identities." *Id*. at *55-57. The court acknowledged that "in our modern era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness would be anathema, and clearly unconstitutional." *Id*. at *57-58. But such laws are relevant because "[t]he Second Amendment's inquiry into historical analogues is not a normative one. Viewing these laws in combination, the above historical laws bespeak a 'public understanding of the [Second Amendment] right' in the period leading up to 1791 at permitting the denial of access to firearms to categories of persons based on their perceived dangerousness." *Id*. at *58. Thus, the court found, "[i]n this historical context, a law such as § 922(n) fits within the tradition of firearms regulation at the time of the nation's founding" because it "imposes a partial limit on the firearms rights of a group of persons defined by objective characteristic that is a fair proxy for dangerousness: an indictment for a felony punishable by a year or more in prison. And the burden § 922(n) imposes is limited in scope (barring the indictee from shipping, transporting, or receiving firearms, but not from possessing them) and time (expiring upon the disposition of the

indictment)." *Id* at \*58-59. The court therefore found that "[t]his aspect of historical firearms regulation is sufficient to sustain § 922(n) against Rowson's challenge." *Id*. at \*59.

The court went on to consider another line of historical analogues, i.e., historical surety laws, and it also found those sufficient to demonstrate that § 922(n) is consistent with the Nation's historical tradition of firearm regulation. *Id*. at \*59-72. The court explained that "[t]hese laws required persons deemed likely to breach the peace or otherwise transgressive to post a bond before publicly carrying a firearm," and observed that "[t]he majority of courts to have considered § 922(n) following *Bruen* have treated such statutes as the most germane historical comparators for § 922(n)." *Id*. at \*59 (collecting cases). The court discussed treatises and laws (such as those offered by the Government in this case) in support of its assertion that "Colonial and American surety laws derived from a longstanding English tradition of authorizing government agents to seize arms from persons who acted unlawfully or in a manner that threatened the public." *Id*. at \*59-61. The court also examined surety laws discussed in *Bruen* which were "enacted in the years immediately before and after the Second Amendment's adoption [which] aimed to neutralize people who were armed in ways that could cause alarm." *Id*. at \*61-63. Although the Court in *Bruen* found that those laws were inapposite to the regulation at issue in that case—a New York statute which

conditioned the right to a license to carry a handgun in public on a showing of a "special need" for self-protection—the court in *Rowson* found that "the surety laws, considered collectively, are 'relevantly similar' to § 922(n)." *Id*. at \*63. The court observed that, as explained in *Bruen*, the determination of whether a historical analogue is "relevantly similar" turns on " 'whether modern and historical regulations impose a comparable burden on the right of self-defense and whether that burden is comparably justified.' " *Id*. \*64-65 (quoting *Bruen*, 142 S. Ct. at 2133). As to whether the surety laws and § 922(n) "impose a comparable burden on the right of self-defense," the court in *Rowson* observed that "the surety laws—like § 922(n), but unlike the New York 'proper cause' law at issue in *Bruen*—presume that individuals have the right to bear arms," and "imprisoned or otherwise restricted only those persons who had disturbed the peace or whose public possession of a firearm, as determined by a justice of the peace or other legal process, was otherwise likely to spread fear among the public." *Id*. at \*65. Similarly, § 922(n) "applies only to a subset of persons—felony indictees—as to whom probable cause has been found, by a grand jury or its prosecutorial equivalent in the context of a consented-to felony information, to have committed a serious crime. And they impose a burden with respect to the firearms that is comparable or, arguably, less" than the surety laws." *Id*. The court explained, "Unlike the surety laws, which deprived citizens of the right to possess firearms, §

28

922(n) does not disturb the indictee's right to continued possession of a firearm; instead, it limits the ability of the indictee to ship, receive, or transfer firearms during the pendency of the indictment." *Id*. at *65-66). The court also found "comparable justification" between the surety laws and § 922(n): "the period in which an indictment pends is 'a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves and to others,' thereby giving rise to fears of threats or violence among the community." *Id*. at *66 (quoting *United States v. Kays*, 624 F. Supp. 3d 1262, 1268 (W.D. Okla. Aug. 29, 2022) (internal quotation omitted)). Thus, the court found that "the Government has satisfied its burden to justify § 922(n) with reference to historical antecedents. Section 922(n), the Court holds, is consistent with the Nation's history of firearms regulation."  *Id*. at *71-72.

Based on the authority provided in the Government's response to Defendant's motion as well as the reasoning and conclusions reached by the majority of courts that have considered this issue post-*Bruen* discussed above, the undersigned finds that the Government has met its burden of demonstrating that 18 U.S.C. § 922(n) is consistent with the Nation's history of firearm regulation, shown by the "relevantly similar" historical analogues of laws disarming persons considered to be at heightened risk of dangerousness or criminality and historical surety laws as discussed in *Adger*, *Smith*, *Rowson* et al.

The undersigned acknowledges Defendant's arguments to the contrary (*see* Doc. 52, 58) and recognizes that a few district courts have rejected the Government's reliance on historical laws disarming the "unvirtuous" or "dangerous" and surety laws, and these courts have held that 18 U.S.C. § 922(n) violates the Second Amendment based on their analyses under *Bruen*. *See United States v. Hicks*, No. W:21-CR-00060-ADA, 2023 U.S. Dist. LEXIS 35485 (W.D. Tex. Jan. 9, 2023); *United States v. Stambaugh*, No. CR-22-00218-PRW-2, 2022 U.S. Dist. LEXIS 206016 (W.D. Okla. Dec. 14, 2022); *United States v. Quiroz*, 629 F. Supp. 3d 511 (W.D. Tex. 2022). The Court notes that two other judges in the Western District of Texas later declined to follow the *Hicks* and *Quiroz* decisions and found that § 922(n) does not violate the Second Amendment. *See Rios*, 2023 U.S. Dist. LEXIS 92413, at *2-4 (noting split of authority in Western District of Texas and rejecting defendant's argument that § 922(n) is unconstitutional); *Simien*, 2023 U.S. Dist. LEXIS 23629, at *9-20 (noting split of authority and finding that historical surety laws supply a sufficient historical analogue to find that § 922(n) does not violate the Second Amendment); *Posada*, 2023 U.S. Dist. LEXIS 70981, at *13 (finding that the historical detention laws proffered by the Government were a sufficient historical analogue to § 922(n) to meet the Government's burden, noting that "[t]his conclusion is consistent with the robust majority of courts to have considered § 922(n)'s constitutionality since

*Bruen*," and "respectfully disagree[ing] with" the *Hicks* and *Quiroz* decisions). A post-*Bruen* split of authority also exists in the Western District of Oklahoma, with another judge in that District finding that § 922(n) does not violate the Second Amendment. *See Kays*, 624 F. Supp. 3d at 1267-68 (finding that mid-19th century surety laws discussed in *Bruen* "are proper analogues for § 922(n)," and "[t]he government's reliance on these surety laws is sufficient to satisfy its burden to justify the firearm regulations of § 922(n)").

The Court also notes that in *United States v. Holden*, 638 F. Supp. 3d 931 (N.D. Ind. 2022), the court found that § 922(n) is unconstitutional in dismissing the indictment against the defendant for falsely stating that he was not under indictment on his ATF Form 4473 to purchase a firearm, in violation of 18 U.S.C. § 922(a)(6). *Id*. at 934-938. The Seventh Circuit reversed that decision in *United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023). The appeals court observed that "[t]he main problem with the district court's approach is that Holden was not charged with violating § 922(n). He was charged with making a false statement to a firearms dealer, in violation of § 922(a)(6)," the constitutionality of which the defendant did not challenge. *Id*. at 1017. The court also reasoned, "[n]or is it likely that § 922(n) would be invalid across the board," noting that "[g]overnments may keep firearms out of the hands of dangerous people who are apt to misuse them." *Id*. at 1018. The court explained, however, that "[t]his is not the proceeding . . . in

which to adjudicate a contention that any particular application of § 922(n) violates the Second Amendment. Our discussion is designed to show that the statute's status remains unresolved." *Id*. The Fifth Circuit has also observed that "[t]here is no binding precedent holding § 922(n) unconstitutional, and it is not clear *Bruen* dictates such a result," so the defendant was unable to "demonstrate the requisite clear-or-obvious error" in making his Second Amendment challenge to § 922(n), raised for the first time on appeal. *United States v. Rodriguez*, No. 22-10896, 2023 U.S. App. LEXIS 15112, at *2 (5th Cir. June 16, 2023); *see also United States v. Morrison*, No. 22-10570, 2023 U.S. App. LEXIS 5301 (5th Cir. Mar. 6, 2023) ("This court has rejected the notion that § 922(n) is clearly or obviously unconstitutional under *Bruen*." (citing *United States v. Avila*, No. 22-50088, 2022 U.S. App. LEXIS 35321, at *3-4 (5th Cir. Dec. 21, 2022) (finding no plain error because "[t]here is no binding precedent holding § 922(n) unconstitutional and noting that "several other federal courts" had found that historical analogues supported the constitutionality of § 922(n) (collecting cases))).

As discussed above, the undersigned finds persuasive the reasoning of the majority of courts that have considered the issue post-*Bruen* and have found that 18 U.S.C. § 922(n) is consistent with the Nation's historical tradition of firearm regulation. Defendant's contentions and the discussions in *Quiroz*, *Hicks*, and *Stambaugh* do not alter that conclusion. The undersigned finds that the

Government has demonstrated that 18 U.S.C. § 922(n) is consistent with the Nation's historical tradition of firearm laws, based on its history of disarming persons perceived on heightened risks of dangerousness or criminality and also based on historical surety laws, and therefore, 18 U.S.C. § 922(n) does not violate the Second Amendment. Thus, it is **RECOMMENDED** that Defendant's motion to dismiss the Second Superseding Indictment as violative of the Second Amendment (Doc. 52) be **DENIED**.

## II.  <u>Motion To Dismiss For Failure To State An Offense (Doc. 53)</u>

Defendant moves to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) and the Fifth Amendment to the United States Constitution "on the grounds that the charges fail to state a federal criminal offense and are unconstitutionally vague." (Doc. 53 at 1). Specifically, Plaintiff argues that the Indictment should be dismissed because: (1) the Indictment fails to state an offense because Defendant was not "under indictment" as required by 18 U.S.C. § 922(n) "at the time that he is alleged to have received firearms" in Counts One and Two;[3] (2) 18 U.S.C. § 922(n) "is unconstitutionally vague and violates

---

[3] This argument is directed at the allegation in Counts One and Two that Defendant received firearms while he was under Indictment in Fannin County for the 2015 arson count. Defendant does not argue that he was not under Indictment as of February 22, 2022 as alleged in Count Two by virtue of the February 2022 Gilmer County indictment. Defendant contends, however, that both counts should be dismissed because the Government used the conjunctive "and" in Count Two concerning both indictments. (Doc. 53 at 3 n.1). As discussed below, the

[Defendant's] right to Due Process under the Fifth Amendment because it does not give sufficient notice as to what specific conduct is unlawful"; and (3) "to the extent that § 922(n) is merely ambiguous, the rule of lenity requires that those ambiguities be resolved in [Defendant's] favor, which requires dismissal of the indictment." (Doc. 53 at 4-7).

### A.   Whether Defendant Was Under Indictment For Purposes Of § 922(n)

18 U.S.C. § 922(n) provides, "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." "The term 'indictment' includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted."  18 U.S.C. § 921(a)(14).

Defendant contends that he was no longer "under indictment" as required by § 922(n) during the dates charged in the Indictment, i.e., between December 20, 2019 and December 14, 2021 (Count One) and between November 17, 2022 and February 21, 2023 (Count Two), because Defendant "had entered a plea in his

undersigned finds that Defendant was "under indictment" for purposes of 18 U.S.C. § 922(n) with respect to the 2015 Fannin County indictment, so dismissal is not required of either count.

prior state case under the Georgia First Offender Act and was in the process of serving his sentence." (Doc. 53 at 4). Defendant asserts that "[t]he charging and prosecution of the case had, unquestionably, ended years before the alleged conduct." (*Id.*)

The Eleventh Circuit has not addressed this issue, but judges in this District, including the undersigned, have found no merit to Defendant's contentions. *See United States v. Williams*, No. 1:20-CR-85-MLB-CCB, 2021 U.S. Dist. LEXIS 65969 (N.D. Ga. Feb. 11, 2021), *adopted by* 2021 U.S. Dist. LEXIS 65321 (N.D. Ga. Apr. 5, 2021) (finding that defendant was "under indictment" for purposes of 18 U.S.C. § 922(n) where he pleaded guilty to state felony charge under Georgia's First Offender Act); *United States v. Bonds*, No. 2:16-CR-00034-WCO-JCF, 2017 U.S. Dist. LEXIS 109543 (N.D. Ga. Mar. 10, 2017) (same), *adopted by* 2017 U.S. Dist. LEXIS 109080 (N.D. Ga. July 13, 2017). In both *Williams* and *Bonds*, the Court found persuasive the Tenth Circuit's decision in *United States v. Saiz*, 797 F.3d 853 (10th Cir. 2015). In *Saiz*, the defendant pleaded guilty to various state law crimes in New Mexico, and "they were conditionally discharged under state law, which meant that if he completed a term of probation they would be dismissed." *Id.* at 854. While he was on probation, he committed and was convicted of federal firearm offenses, and his sentence was enhanced because he was a "prohibited person" pursuant to 18 U.S.C. § 922(n), which includes "any person who is under

indictment for a crime punishable by imprisonment for a term exceeding one year." *Id.* at 855.  The defendant argued that he was not eligible for enhanced sentencing based on § 922(n) because he was not "under indictment" when he committed the charged federal firearms offenses "because being subject to a conditional discharge does not count as being 'under indictment.' " *Id.* at 854. The Tenth Circuit "disagree[d] and conclude[d] that an offender subject to conditional discharge is still under indictment until the condition is met—completion of the term of probation." *Id.*

In rejecting the defendant's contention "that an indictment dissipates when the defendant pleads guilty in state court and the court imposes probation and conditional discharge," the court looked to New Mexico's conditional discharge scheme, under which "[a] defendant who receives conditional discharge under New Mexico law is 'neither "adjudicated guilty" nor "convicted." ' " *Id.* at 855 (quoting *State v. Herbstman*, 126 N.M. 683, 974 P.2d 177, 183 (N.M. Ct. App. 1998)). Moreover, the charges are not dismissed until "a defendant subject to a conditional discharge order completes probation . . . .  The charges in an indictment are not extinguished upon the guilty plea or verdict." *Id.* "Instead, they remain in suspension until the defendant completes his term of probation." *Id.* "If the defendant violates the conditions of probation, the court is entitled to 'enter an adjudication of guilt' on the charges without any other formal process." *Id.* (citing

36

N.M. Stat. Ann § 31-20-13(B)). The court observed that "[t]he language of the order imposing Saiz's conditional discharge is consistent with these principles, affirming that 'without an adjudication of guilty, . . . the charges will be discharged' *after* completing probation." *Id.* (emphasis in original). "Thus, Saiz remained under indictment in New Mexico at the time he committed the federal firearms offenses at issue here because the charges were never dismissed." *Id.*

Georgia's First Offender Act similarly provides that the charges are not adjudicated or discharged when a defendant pleads guilty under that Act. "The series of statutes known as the First Offender Act deal with sentencing options for a person not previously convicted of a felony.  Such a person is permitted to enter a plea of guilty or nolo contendere, to serve the probationary sentence or term of imprisonment handed down, and to be discharged without court adjudication of guilt and without a record of a criminal conviction." *Davis v. State*, 269 Ga. 276, 496 S.E.2d 699, 702 (Ga. 1998) (citing O.C.G.A. §§ 42-8-60, 42-8-62(a)). When Defendant pleaded guilty under the First Offender Act in December 2015, the First Offender Act provided in relevant part:

> (a) Upon a verdict or plea of guilty or a plea of nolo contendere, but before an adjudication of guilty, in the case of a defendant who has not been previously convicted of a felony, the court may, without entering a judgment of guilt and with the consent of the defendant:
>   (1)  Defer further proceeding and place the defendant on probation as provided by law; or
>   (2) Sentence the defendant to a term of confinement as provided by law.

> (b)  Upon violation by the defendant of the terms of probation, under a conviction for another crime during the period of probation, or upon the court determining that the defendant is or was not eligible for sentencing under this article, the court may enter an adjudication of guilt and proceed as otherwise provided by law.

O.C.G.A. § 42-8-60(a)-(b). The statute also provided, "Upon fulfillment of the terms of probation, upon release by the court prior to the termination of the period thereof, or upon release from confinement, the defendant shall be discharged without court adjudication of guilt . . . .   [T]he discharge shall completely exonerate the defendant of any criminal purpose and shall not affect any of his or her civil rights or liberties; and the defendant shall not be considered to have a criminal conviction." "   O.C.G.A. § 42-8-62(a).   Thus, under Georgia law, "first offender status is not considered an adjudication of guilt," *Rivers v. State*, 296 Ga. 396, 768 S.E. 2d 486, 492 (Ga. 2015), and "[a] first offender's guilty plea does not constitute a conviction as that term is defined in the Criminal Code of Georgia," *Davis*, 496 S.E.2d at 702; *see also Davis v. State*, 273 Ga. 14, 537 S.E. 2d 663, 665 (Ga. 2000) ("Under the first offender statute, until an adjudication of guilt is entered, there is no conviction."). "Under the first offender statute, the case 'has, in effect, been suspended' during the period of probation." *Davis*, 537 S.E.2d at 665.

Here, Defendant pleaded guilty and was sentenced under the First Offender Act, which did not then result in an adjudication of guilt. Rather, the adjudication of his guilt on the arson charge was deferred until he either successfully completed

his First Offender Act sentence (at which point he would be exonerated), or if he did not successfully complete the terms of his probation, he could be adjudicated guilty and sentenced to the maximum sentence for the arson count, as explained by the sentencing judge (Doc. 53-1 at 11-12) and in his sentencing document (Doc. 53-1 at 2). As the Court in *Williams* explained, "[t]he critical point is that, in a First Offender Act case, the entry of a guilty plea does not result in an adjudication of guilt—it simply starts the process of allowing the defendant to serve his sentence, with the matter only later ending in either exoneration if the defendant performs well or adjudication of guilt if he does not." 2021 U.S. Dist. LEXIS 65969, at *10. "And because a First Offender Act defendant stands neither convicted nor discharged during the period of probation, the necessary implication is that he therefore remains subject to the indictment—in terms of § 922(n), he is 'under indictment.' " *Id*.

The undersigned finds persuasive the court's reasoning in *Saiz*, in which the Tenth Circuit found that the defendant was "under indictment" after he pleaded guilty under a law similar to Georgia's First Offender Act, and the court's reasoning in *Williams*, in which the court found that the defendant was under indictment for purposes of § 922(n) where he pleaded guilty and was under probation pursuant to Georgia's First Offender Act. The undersigned therefore finds that Defendant was "under indictment" for purposes of 18 U.S.C. § 922(n)

when he allegedly committed the federal firearms offense at issue here because he had not yet been adjudicated guilty on the 2015 charged state offense, nor had the charge been discharged or dismissed. *See, e.g.*, *Saiz*, 797 F.3d at 856; *United States v. Valentine*, 401 F.3d 609, 616-16 (5th Cir. 2005) (finding that the defendant was "under indictment" for purposes of § 922(n) where he was indicted for theft and received five years deferred adjudication because Texas's deferred adjudication system leaves a defendant with a pending charge without an adjudication of guilt or conviction); *Williams*, 2021 U.S. Dist. LEXIS 64969, at *10-15 (finding that defendant was "under indictment" for purposes of § 922(n) where he pleaded guilty and was on probation under Georgia's First Offender Act); *United States v. Larkins*, No. 13-CR-172-CVE, 2013 U.S. Dist. LEXIS 174496, at *7-16 (N.D. Okla. Dec. 11, 2013) (finding that the defendant was "under indictment" where he pleaded guilty and received deferred sentences because under Oklahoma law a deferred sentence is not a conviction, and the charge remains pending until or unless the defendant completes the conditions of the deferred sentence); *Bonds*, 2017 U.S. Dist. LEXIS 109543, at *8-17 (finding that defendant was "under indictment" for purposes of § 922(n) where he pleaded guilty and was on probation under Georgia's First Offender Act).

In his reply, Defendant cites to two cases to support his contention that he was not under indictment after he pleaded guilty under the First Offender Act,

*United States v. Hartsfield*, 387 F. Supp. 16 (M.D. Fla. 1975) and *United States v. Hill*, 210 F.3d 881 (8th Cir. 2000). (*See generally* Doc. 57). In *Hill*, the court found that the defendant was not "under indictment" pursuant to Missouri law where he had pleaded guilty to a state charge, the court placed him on probation, but suspended his sentence until his probation ended at which time "the court could fully discharge Hill from its jurisdiction without entering a judgment of conviction." 210 F.3d at 883. The court observed that under Missouri law, the primary purpose of an indictment or information is to give the defendant notice of the charge against him, and "[b]y entering a guilty plea, Hill admitted each allegation contained in the indictment." *Id.* at 884. "Its primary function satisfied, the indictment served no further purpose and was thus extinguished." *Id.* The court also rejected the district court's conclusion "that the indictment survived the guilty plea as a means of conferring continuing jurisdiction over Hill, necessary for the court to impose a sentence of prison time in the event that Hill violated the terms of his probation." *Id.*

In *Hartsfield*, the court considered whether the defendant, who had pleaded guilty but adjudication of guilt and imposition of sentence were withheld, was "under indictment" while he was on probation. 387 F. Supp. at 16-17. The court wrote that "the critical question is whether, at the time of the purchase of the gun, defendant had been 'convicted' under state law" because "[o]nce there has been a

'conviction,' the indictment or information becomes superfluous in a practical sense, as the guilt of the accused has been determined and he no longer can be tried on the indictment or information." *Id.* at 17. The court then reviewed Florida law and determined that "under Florida law, the defendant would be considered convicted upon the entry of his plea of guilty." *Id.* at 17-18.

The court in *Saiz* acknowledged that the defendant's "argument is not without support, however," noting that the defendant cited to, among other cases, *Hill* and *Hartsfield*, but the court did not find those cases persuasive. *See Saiz*, 797 F.3d at 856-58. Neither does the undersigned. *Hartsfield* is easily distinguishable because the court in that case found that under Florida law the defendant was "convicted" when he entered his plea of guilty, 387 F. Supp. at 18, but as discussed above, Georgia law clearly states the opposite. *See Davis*, 496 S.E.2d at 702 ("A first offender's guilty plea does not constitute a conviction as that term is defined in the Criminal Code of Georgia[.]"); *see also Saiz*, 797 F.3d at 857-58 ("Whatever the merits of that court's interpretation of Florida law [in *Hartsfield*], New Mexico courts have stated that persons granted conditional discharge are 'neither "adjudicated guilty" nor "convicted" ' " (citing *Herbstman*, 974 P.2d at 183)).

As to Defendant's reliance on *Hill*, the court in *Saiz* acknowledged that "the Missouri statute [at issue in Hill] and the New Mexico statute are more or less

identical," but nevertheless disagreed with that decision. 797 F.3d at 857. The court explained:

> Although it is true that an indictment's purpose is to inform a defendant of the charges against him, we find no support for the proposition that a defendant is no longer subject to an indictment after he pleads guilty and before he is adjudged guilty. To the extent that a conditional discharge puts off a finding of guilt, it simply prolongs the life of the indictment. A holding to the contrary would be incongruous with the requirement that "charges" are only "dismissed" when the defendant completes the probationary period . . ., as well as the fact that the defendant is never convicted unless he violates the terms of release . . . . If the indictment dissipated at the time of the guilty plea, there would be no more charges to dismiss and no chance of a future conviction. The statutory scheme exists precisely to give a defendant a chance to avoid a finding of guilt, while preserving the threat posed by the indictment until the completion of probation.

797 F.3d at 857. The undersigned agrees with that reasoning and therefore finds the court's analysis in *Hill* unpersuasive, as did the Court in *Williams*. *See Williams*, 2021 U.S. Dist. LEXIS 65969, at *12-13 (acknowledging a lack of "meaningful distinction" between the statutory schemes in *Hill*, *Saiz*, and the Georgia First Offender's Act, but finding persuasive the *Saiz* court's explanation for why it disagreed with *Hill*).

In his reply, Defendant points out "[t]here is no binding precedent in this circuit" that supports the Government's position (and the Court's finding) that Defendant was "under indictment." (Doc. 57 at 2). That is true, but the undersigned has explained that persuasive authority exists that supports that position. Defendant challenges the Government's reliance on *Bonds*, in which the court

43

rejected many of the same arguments Defendant makes here, because the defendant in *Bonds* did not object to the undersigned's recommendation that the Court deny his motion to dismiss the indictment on the same grounds advanced in the instant case, "effectively abandoning the issue that [Defendant] now pursues." (Doc. 57 at 3; *see also United States v. Bonds*, No. 2:16-CR-0034-RWS-JCF, 2017 U.S. Dist. LEXIS 109080 (N.D. Ga. July 13, 2017)). That fact does not undermine the Court's findings and conclusions in *Bonds* or in this case. The undersigned notes that in *Williams*, the defendant did object to the Magistrate Judge's recommendation that the Court deny the defendant's motion to dismiss on the same grounds, and the District Judge overruled those objections, adopted the recommendation, and denied defendant's motion. *See United States v. Williams*, No. 1:20-cr-85-MLB, 2021 U.S. Dist. LEXIS 65321, at *6-11 (N.D. Ga. Apr. 5, 2021). In reaching that decision, District Judge Michael L. Brown considered the Eighth Circuit's *Hill* case, which supports Defendant's position, and the Tenth Circuit's *Saiz* decision, which supports the Government's position. *Id*. at *9-11. Judge Brown wrote, "[t]he Court agrees with the Tenth Circuit, disagrees with Eighth Circuit, and finds that Defendant Williams was 'under indictment' at the time of the federal gun offense." *Id*. at *11. The undersigned agrees with Judge Brown.

Defendant also argues that "a Georgia defendant who has pleaded as a first offender and been sentenced under the statute can file a direct appeal of their guilty plea and sentence—a remedy that is not available to [a] defendant who is under indictment." (Doc. 57 at 5). Defendant quotes from *Dean v. State*, 177 Ga. App. 123, 124-25 (1985), in which the Georgia Court of Appeals wrote that "first-offender status takes the place of a 'sentence' and once imposed upon a criminal defendant, his case assumes the mantle of finality necessary to bring a direct appeal of his conviction pursuant to O.C.G.A. § 5-6-34(a)(1)." (Doc. 57 at 5-6). The court in *Williams* rejected the same argument: "But the right to appeal recognized in *Dean* is simply the right to appeal from the imposition of a First Offender sentence—it says nothing about whether the charges remain pending. Indeed, as *Dean* makes clear, a defendant may also later seek to appeal any revocation of the First-Offender probation." 2021 U.S. Dist. LEXIS 65969, at *14. The court noted that the *Saiz* court also "rejected a similar argument, noting that the right to appeal the initial conditional discharge order 'reaffirms that a conditional discharge order does not dispose of the case to the fullest extent possible.' " *Id*. at *14 (quoting *Saiz*, 797 F. 3d at 858). The court in *Williams* explained, "*Dean* itself makes clear that the imposition of a First Offender sentence (even though subject to immediate appeal) does not end the proceedings, and it does not support Defendant's argument that the right to immediately appeal

demonstrates that the indictment is no longer pending." *Id*. at *14-15. The undersigned finds that reasoning persuasive and also finds unavailing Defendant's argument that he was not "under indictment" because he could have immediately appealed his First Offender plea and sentence.

Finally, Defendant contends that "a defendant's guilty plea and sentence under the Georgia First Officer Act make the charges to which he pleaded guilty *res judicata*," and "[t]he first offender plea resolves all issues of fact and law raised by the indictment such that even when the case remains pending, there is finality with regard to the charges and the indictment ceases to have legal effect." (Doc. 57 at 11). The court in *Saiz* rejected almost identical arguments, i.e., "that an indictment triggers the court's jurisdiction and establishes *res judicata* so that the defendant cannot be charged later for the same offense," and "because these purposes are fulfilled once the defendant enters a guilty plea, the plea signals the 'end of the charging phase.' " 797 F.3d at 858 n.6. The court reasoned, "regardless of whether these particular purposes are fulfilled when the defendant pleads guilty, the fact remains under New Mexico law the defendant is not convicted until he violates probation and the charges remain in place until he completes probation." *Id.* As discussed above, the same is true under Georgia law. Thus, even if Defendant's guilty plea and sentence fulfilled some purposes of an indictment, the

state charge remained pending against him, and his case was "suspended during the period of probation." *Davis*, 537 S.E.2d at 665.

Accordingly, to the extent that Defendant moves to dismiss the Second Superseding Indictment on the ground that he was not "under indictment" for purposes of 18 U.S.C. § 922(n), it is **RECOMMENDED** that his motion be **DENIED**.

### B.  Whether 18 U.S.C. § 922(n) Is Unconstitutionally Vague

Defendant also argues that 18 U.S.C. § 922(n) is unconstitutionally vague under the Due Process Clause of the Fifth Amendment.  (Doc. 53 at 7). " 'Vagueness is an outgrowth of the Fifth Amendment's Due Process Clause." *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010). "It encompasses notions of fair warning such that people of common intellect may understand a statute's prohibitions and need not guess at its meaning." *Id.* "[A] criminal statute is unconstitutionally vague and violates due process 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or if 'it authorizes or even encourages arbitrary and discriminatory enforcement.' " *United States v. Moody*, 555 Fed. Appx. 867, 869 (11th Cir. 2014) (unpublished decision) (quoting *Wayerski*, 624 F.3d at 1347). "There is a strong presumption that statutes passed by Congress are valid."  *Wayerski*, 624 F.3d at 1347.

"The first step in a vagueness inquiry is to examine the plain language of the statute." *Wayerski*, 624 F.3d at 1347. " 'The touchstone of the inquiry is the meaning of the statute in light of common understanding and practice.' " *Id.* (quoting *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008)). "When the plain text of the statute sets forth clearly perceived boundaries, our inquiry is ended." *Id.* Here, 18 U.S.C. § 922(n) provides, "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." The statute also explains that "[t]he term 'indictment' includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted." 18 U.S.C. § 921(a)(14). The plain language of that statute thus "sets forth clearly perceived boundaries," i.e., a person under indictment or information is prohibited from shipping or receiving a firearm or ammunition shipped or transported in interstate or foreign commerce.

Defendant contends that § 922(n) is unconstitutionally vague because " '[o]rdinary people' would not understand that they were still under indictment when they had already pleaded guilty, served their entire custodial sentence on the relevant charges, and served several years of probation, including revocation

proceedings, as [Defendant] had in his 2015 Fannin County case." (Doc. 53 at 7).
The undersigned previously found that argument to be without merit, *see Bonds*,
2017 U.S. Dist. LEXIS 109543, at \*17-19, and continues to do so. As discussed
above, Georgia law provides that a guilty plea under the First Offender Act is not
an adjudication of guilt or a conviction, and therefore the offense remains pending
until the defendant either satisfactorily completes probation or the court terminates
the probation, at which time the charge is dismissed, or the court later adjudicates
the defendant guilty due to a violation of the terms of his probation or commission
of a new offense.  Thus, ordinary people of common intelligence would understand
that by pleading guilty pursuant to Georgia's First Offender Act, they remained
under indictment until the charge was dismissed or an adjudication of guilt
occurred.  *See, e.g.*, *Williams*, 2021 U.S. Dist. LEXIS 65969, at \*16-17 (rejecting
defendant's same argument that § 922(n) is unconstitutionally vague (citing *Bonds*,
2017 U.S. Dist. LEXIS 109543)); *United States v. Cunningham*, No. 21-cv20479,
2021 U.S. Dist. LEXIS 200551, at \*9 (E.D. Mich. Oct. 19, 2021) ("The Court finds
§ 922(n) is sufficiently definite to allow a reasonable person to know he may not
receive firearms while under HYTA probationary status because he still faces
active charges that have not been dismissed, expunged, or otherwise favorably
disposed of."); *Larkins*, 2013 U.S. Dist. LEXIS 174496, at \*20 (finding that §
922(n) was not unconstitutionally vague where "Defendant had a felony

information filed against him and the information had not been dismissed, expunged, or otherwise disposed of.  It was still pending and defendant was presumptively aware that he was still subject to sanction if he were to violate his deferred sentences' terms and conditions").

It is therefore **RECOMMENDED** that Defendant's motion to dismiss based on vagueness of 18 U.S.C. § 922(n) be **DENIED**.

### C.   <u>Whether The Rule Of Lenity Applies</u>

Defendant also contends that "to the extent that § 922(n) is merely ambiguous, the rule of lenity requires that those ambiguities be resolved in [his] favor, which requires dismissal of the indictment." (Doc. 53 at 7-8). " 'When ambiguity exists, the ambit of criminal statutes should be resolved in favor of lenity.' " *United States v. Puentes*, 803 F.3d 597, 609 (11th Cir. 2015) (quoting *United States v. Izurieta*, 710 F.3d 1176, 1182 (11th Cir. 2013)). " 'The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree.' " *Id.* at 610 (quoting *Muscarello v. United States*, 524 U.S. 125, 138 (1998)). "Rather, the rule of lenity applies only if there is a 'grievous ambiguity or uncertainty in the statute.' " *Id.* (quoting *Muscarello*, 524 U.S. at 138-39). Defendant has not identified a "grievous" ambiguity in the term "under indictment" or, as discussed above, whether Defendant was "under indictment" under Georgia law. *See, e.g.*,

50

*Williams*, 2021 U.S. Dist. LEXIS 65969, at \*19 ("To the extent that there is any ambiguity in [18 U.S.C. § 922(n)]—and none is apparent—it certain is not 'grievous.' There is no ambiguity in how the statute defines 'under indictment,' nor, as applied here, about whether Defendant was 'under indictment' for purposes of his First Offender Act plea in the Superior Court of Fulton County."); *Larkins*, 2013 U.S. Dist. LEXIS 174496, at \*20-21 (rejecting the defendant's contention that "there is impermissible ambiguity as to whether 'under indictment' includes a defendant subject to a deferred sentence because "[t]he term 'under indictment' . . . is not sufficiently ambiguous for the rule of lenity to apply [and] "Oklahoma law is not ambiguous; a deferred sentence leaves a defendant still 'under indictment' ").

It is therefore **RECOMMENDED** that Defendant's motion to dismiss based on ambiguity of 18 U.S.C. § 922(n) be **DENIED**.

### Summary

It is **RECOMMENDED** that Defendant's Motion To Dismiss Indictment As Violative Of The Second Amendment (Doc. 52) and Motion To Dismiss The Indictment For Failure To State An Offense (Doc. 53) be **DENIED**.

**IT IS ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial.**

51

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 21st

day of November, 2023.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge